IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LOIS KUNKOSKI, Individually and as :
Personal Representative of the Estate of :
Robert W. Clementson, and as next :
friend of Sadie Lee Schaffer and Kearstin:
Leaman Clementson, :
     Plaintiff :
         :
     v. :      CIVIL NO. AMD 03-3296
         :
STATE OF MARYLAND, et al., :
     Defendants :

...o0o...

MEMORANDUM OPINION

Asserting claims in two counts pursuant to 42 U.S.C. § 1983, and additional state law

claims, in her amended complaint, plaintiff Lois Kunkoski, the mother of Robert W.

Clementson, Jr., seeks substantial damages, against numerous defendants, in consequence

of Clementson's death by suicide while he was a pre-trial detainee in Baltimore City. In a

memorandum opinion and order filed on August 2, 2004, the court granted the motion to

dismiss filed by certain defendants employed by the Mayor and City Council of Baltimore

and the Police Department of Baltimore. *See Kunkoski v. State,* 2004 WL 1729459 (Aug. 2,

2004 D.Md.). Thereafter, the court granted in part and denied without prejudice in part the

motion for summary judgment filed by certain defendants employed by the State of

Maryland (hereinafter "the state defendants").[1] The court allowed discovery on a limited

---

[1]In a letter ruling issued on August 30, 2004, the court dismissed all claims asserted
against the state defendants in their official capacities and against the state itself, and all claims
for injunctive relief. The remaining defendants are: Stuart O. Simms, former Secretary of the

                              (continued...)

basis to permit the plaintiff to seek support for her federal claims against the state

defendants. The state defendants have now renewed their motion for summary judgment.

The motion is fully briefed and no hearing is needed. For the reasons stated herein, the court

shall grant the motion for summary judgment as to the federal claims and remand the

remaining claims to state court.

I.

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

247 (1986).  A fact is material for purposes of summary judgment, if when applied to the

substantive law, it affects the outcome of the litigation.  *Id.* at 248.  Summary judgment is

also appropriate when a party "fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of

proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.  317, 322 (1986).

A party opposing a properly supported motion for summary judgment bears the

---

[1](...continued)
Department of Public Safety and Correctional Services ("the Department"); Mary Ann Saar, the
present Secretary of the Department; LaMont W. Flanagan, the former Commissioner of Pre-
Trial Detention Services; William J. Smith, the present Commissioner of Pre-Trial Detention
Services; William J. Jednorski, the former Warden of the Central Booking and Intake Center;
Robert Weisengoff, the Director of the Division of Pretrial Services; and the following line
officers and employees of the Department: Christine James,  Kimberly Ziegelhaefer, Robin
Russell, Casimir Aladi, Asofa Hammond, Roddy Lowry (now deceased), Wendell M. France.

burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S.

at 248-49. "When a motion for summary judgment is made and supported as provided in

[Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse

party's pleading, but the adverse party's response, by affidavit or as otherwise provided in

[Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.

R. Civ. P. 56(e). *See Celotex Corp.*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252; *Shealy v.*

*Winston,* 929 F.2d 1009, 1012 (4th Cir. 1991). Of course, the facts, as well as the justifiable

inferences to be drawn therefrom, must be viewed in the light most favorable to the

nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587-88 (1986). The court, however, has an affirmative obligation to prevent factually

unsupported claims and defenses from proceeding to trial. *See Felty v. Graves-Humphreys*

*Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

II.

In the earlier memorandum opinion, the court recited the background facts as follows,

in part:

> Robert W. Clementson, Jr., was a recovering heroin addict suffering
> from depression, among other health problems. In the fall of 2000, as a result
> of personal difficulties, he relapsed after a period of sobriety. As a result, he
> resorted to theft as a means to support his habit, including the theft of jewelry
> from his mother, plaintiff Kunkoski. In an effort to ensure that he receive drug
> treatment, Kunkoski filed a sworn "Application for Statement of Charges"
> with a court commissioner at the District Court of Maryland for Carroll
> County, alleging theft. Both orally and in writing in the Application, Kunkoski
> informed the court commissioner that Clementson had threatened to commit
> suicide if Kunkoski filed charges against him for the theft of her jewelry. The

court commissioner issued a charging document and an arrest warrant based on the Application filed by Kunkoski.

Twenty-nine days later, on November 15, 2000, at about 10:30 a.m., defendant Marianetti, a Baltimore City police officer, arrested Clementson at his job in Baltimore, based on the warrant issued in Carroll County, and transported Clementson to the CIBC. At CIBC, Marianetti relinquished custody of Clementson to CIBC officers. Thereafter, according to the amended complaint, the following series of events occurred:

> [Clementson]'s booking process was initiated at approximately 11:37 a.m. As part of the booking process, [Clementson] completed an Offender Medical/Medical health Screening Report and reported to [defendant Kimberly Ziegelhaefer, identified as a "booking officer" at CIBC] that he was prescribed medication for a medical condition, that he currently received treatment for a mental health condition, that he had been evaluated for a mental health issue or had been admitted to a psychiatric hospital, and that he had used drugs or alcohol within the previous 72 hours . . . [and] that he took antidepressants and would go through heroin withdrawal . . . . Ziegelhaefer failed to apprise the other [CIBC] staff that [Clementson] was to receive appropriate medical and health care.

> Instead of being housed in the hospital, [Clementson] was incarcerated in a cell that had sheets on the bed, a sprinkler head on the wall, and that was out of view of the CIBC employees . . . . On November 16, 2000 [Clementson] called Robin Statler [the mother of his daughter] at approximately 1:00 a.m. in the morning from CIBC, and at approximately 2:30 a.m. an unidentified Pretrial Release employee conducted a background investigation regarding [Clementson] and called Robin Statler . . . who informed said employee that [Clementson] was a heroin addict and suicidal . . . .

> At approximately 3:00 a.m., [Clementson] was alive but distraught and called his mother [plaintiff] to identify an accomplice in the theft at her home and during this period of incarceration, [Clementson] made at least one unsuccessful attempt to hang himself and the attempted and successful suicide attempts by [Clementson] were made in his cell in plain view and open sight and sound of any person in the vicinity of his cell . . . .

At 4:55 a.m. an employee from the Pretrial Release [Division] faxed a notice to the shift Commander of the unit in which [Clementson] was placed, that [Clementson] was at risk for suicide . . . . [Clementson] committed suicide on November 16, 2000, by hanging himself from a sprinkler in his cell . . . . He was found hanging in his jail cell at approximately 8:15 a.m. and died at 9:23 a.m.

Amended Complaint, ¶¶ 37-42.

Although it serves as a pretrial detention center solely for Baltimore City arrestees, CIBC is operated by the State of Maryland and is staffed by state employees. The gravamen of plaintiff's claims is that numerous state officials, including the past and present state Secretaries (and Assistant Secretaries) of Public Safety and Correctional Services, the present and past Wardens of CIBC, and numerous others (the motion to dismiss filed on behalf of whom will be separately considered), together with the present Baltimore City police movants, through their acts and omissions, proximately caused and/or culpably failed to prevent Clementson's suicide. These alleged acts and omissions included, but are not limited to, failures to: (1) fund adequately (or to seek adequate funding for) CIBC, so as to make it a safe and secure pretrial detention facility, including funding for adequate corrections and medical staff; (2) train and educate existing staff in mental health protocols, including suicide prevention protocols; and, (3) supervise and monitor staff. In support of her allegations, Kunkoski alleges that in a six month period in 2000, there were at least seven suicides at CIBC, allegedly indicating a constitutionally deficient suicide prevention system. Kunkoski further alleges that defendants violated minimally appropriate detention standards in that they: (1) failed to maintain a jail video monitoring system; (2) failed to ensure that the design of CIBC holding cells protected the lives of suicidal detainees; and (3) failed to ensure that the sprinkler system was designed to preclude a detainee from using a part of the system to commit suicide.

*See* 2004 WL 1729459 at *1-*2.

Having been permitted to take discovery as to the specific events which occurred after Clementson was delivered to the custody of the state defendants, plaintiff has now been able to provide substantial evidence as to the sequence of events leading up to his suicide. Clementson entered the custody of the state defendants at approximately 11:37 a.m. on

November 15, 2000. The booking officer, defendant Ziegelheafer, referred him for a medical evaluation, which apparently occurred some six or seven hours later at about 6:36 p.m. Clementson's medical questionnaire reflects that he reported that was receiving treatment for a "mental health condition," that he was taking antidepressants, and that he had used "alcohol or drugs such as cocaine, heroin, PCP, or LSD in the past 72 hours." Clementson refused to undergo a physical examination.

By about 9:50 p.m., Clementson had seen the court commissioner for his bail hearing. The record reveals that the court commissioner conducting the bail hearing specifically learned during the hearing, and included in his order setting bail, that Clementson may be "dangerous to himself or others." Furthermore, the record shows that a pre-trial investigator trainee, who compiled information on Clementson after the court commissioner had set bail and who interviewed Clementson and his family members, also learned specifically that Clementson was not simply a heroin addict and that he had been prescribed antidepressant medications (which were not in his possession at the time of his arrest and commitment), but that he was a genuine suicide risk. In particular, she learned that Clementson had attempted suicide on more than one occasion. The record further reveals that that officer, *who is not a defendant in this action*, failed to take reasonable steps to ensure that her actual knowledge of a significant suicide risk was communicated to the officers who were responsible for Clementson's housing assignment and monitoring during his detention. Rather, that officer faxed a copy of her report alerting the detention facility personnel of the fact that

Clementson posed a suicide risk to the "shift commander at medical." *See* Plf.'s ex. 1, at 33.[2]

The record does not reveal what happened to, or who received, the faxed forms

notifying the staff that Clementson was a genuine suicide risk. It is undisputed, however, that

the officer whose duties included assigning Clementson to a cell never learned that he was

a suicide threat or, for that or any other reason, Clementson required close monitoring. *See*

*id.* at 55-56.

Clementson was found hanging in his jail cell at approximately 8:15 a.m. (only ten

minutes after a correctional officer had spoken to him as he lay on his bunk) and died at 9:23

a.m.

III.

Plaintiff's showing of extraordinary gross negligence by the pre-trial investigator staff

and the correctional staff at CIBC is stupefying. Nevertheless, the state defendants' motion

for summary judgment must be granted as to the federal claims. As the court reasoned in

granting the earlier motion to dismiss:

---

[2]The form containing the suicide risk disclosure is addressed to "Shift Commander" and contains Clementson's name and identification number. Thereafter, the form contains two checkboxes, as follows: "DEF. IS AT RISK FOR ONE OR MORE OF THE FOLLOWING: SUICIDE:___ ESCAPE:___." The checkbox for suicide is checked. The bottom of the form contains a space for "INVESTIGATOR NOTES," in which the investigator trainee had written: "Def. stated that he attempted suicide in 1998."

After the initial fax to "Shift Commander" at about midnight by the investigator trainee, a second pretrial investigator spoke to one of Clementson's family members who orally advised her of his threat to commit suicide. Accordingly, that investigator (also not a defendant here) faxed another copy of the form to "Shift Commander," stating "[defendant] threatened to commit suicide if prosecuted." As mentioned in text, the record does not disclose who, if anyone, ever received the first or the second fax.

[A]ll of plaintiff's federal claims reduce to a fourteenth amendment claim of deliberate indifference by governmental officials to the significant medical needs of a pre-trial detainee . . . . The standards for such a claim are well settled, as the Fourth Circuit recently reiterated:

> Although [appellant] asserts four independent constitutional claims in the complaint, his claims boil down to one relevant question: whether the individual defendants violated [decedent's] Fourteenth Amendment rights as a pre-trial detainee through their deliberate indifference to a substantial risk of physical harm . . . .
>
> As a general matter, "[o]nly governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." The degree of culpability on the part of a governmental actor that is sufficient to shock the conscience will depend on the circumstances of any given case. In cases where the government is accused of failing to attend to a detainee's serious medical needs . . . , "conduct that amounts to 'deliberate indifference' . . . is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim."
>
> "Deliberate indifference is a very high standard--a showing of mere negligence will not meet it." An officer is deliberately indifferent to a substantial risk of harm to a detainee when that officer "knows of and disregards" the risk. In order to be liable under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Stated somewhat differently, "[d]eliberate indifference requires a showing that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee or that they *actually knew of* and *ignored* a detainee's serious need for medical care."
>
> Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. *Rich v. Bruce,* 129 F.3d 336, 340 n. 2 (4th Cir.1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." *Id.* As with the subjective

> awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient. *See Brown v. Harris,* 240 F.3d 383, 390-91 (4th Cir.2001).
>
> *Parrish v. Cleveland*, 372 F.3d 294, 302-04 (4th Cir. 2004)(first two alterations added; footnotes and some citations omitted).

*See* 2004 WL 1729459 at *3-*4.

Plaintiff has failed to project substantial evidence that any member of the pretrial investigation or correctional staffs was "deliberately indifferent" to the risk of suicide presented by Clementson. Although the plaintiff has demonstrated that the pretrial investigators clearly "subjectively recognized a substantial risk of harm" to Clementson if their knowledge that he was a genuine suicide risk was not effectively communicated to the proper correctional officers, there is a complete lack of evidence on the issue of whether the investigators "subjectively recognized that [their] actions were 'inappropriate in light of that risk.'" *Id*. In fact, the investigators' use of a *facsimile machine* in their failed attempt to communicate the critical information shows precisely that they understood the need to take appropriate action to address the risk of suicide. The patent inappropriateness of such a method to send such life-and-death information under the circumstances is obvious in hindsight, but it is hardly probative of "deliberate indifference" on the part of any member of the CIBC staff. It affirmatively undermines any proof of deliberate indifference.

Plaintiff takes an alternative tack: that Clementson's suicide was caused by supervisory "deliberate indifference" in that the *lack of a policy* requiring more appropriate and efficacious means of communicating suicide and similar medical risks is an adequate

basis on which to impose liability upon one or more of the state defendants. The court is constrained to reject this contention. Thankfully, it appears that such a policy may *now* exists. Nevertheless, a poorly-conceived or poorly-executed policy, by itself, is not probative of a supervisor's culpable tolerance of a course of unconstitutional deprivations. *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994) (elements of supervisory liability under §1983). Finally, to the extent that plaintiff contends that once the correctional staff discovered Clementson hanging from the sprinkler head in his cell, after being alerted to the incident by his cellmate, correctional officers displayed "deliberate indifference" in their response, the record lacks any substantial evidence to support such a claim.

IV.

For the reasons set forth, the motion for summary judgment filed by the state defendants shall be granted as to all federal claims. In the absence of diversity of citizenship jurisdiction, I decline to exercise supplemental jurisdiction over plaintiff's state law claims. *See generally Andrews v. Anne Arundel County, Md.,* 931 F.Supp. 1255, 1267-68 (D.Md.1996), *aff'd,* 114 F.3d 1175 (4th Cir.)(table), *cert. denied,* 522 U.S. 1015 (1997). Accordingly, the state law claims shall be remanded to the Circuit Court for Baltimore City.


Filed: May 6, 2005                                         /s/
                                         ANDRE M. DAVIS
                                         UNITED STATES DISTRICT JUDGE